UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| CWI CHEROKEE LF LLC | ) | CASE NUMBER: 23-52262-SMS |
| | ) | |
| Debtor. | ) | |
| | ) | |

## NOTICE OF CANCELLATION OF AUCTION
## AND PROPOSED SALE

COMES NOW CWI Cherokee LF, LLC and reports the results of the sales process approved by the Court's *Order on Debtor's Motion to Sell Assets Free and Clear of Liens, Claims and Encumbrances, Directing Bidding Procedures, and Setting Preliminary and Final Hearings* [Doc. 107] (the "Sale Procedures Order"), as modified.

Following marketing and solicitation of bids as set out in the Sale Procedures Order, Debtor received proposals from several interested parties, including the Solid Waste Disposal Authority of the Cities of Muscle Shoals, Sheffield, and Tuscumbia, Alabama (the "Authority"); however, Debtor, in consultation with UMB Bank, N.A. (the "Bond Trustee") and its investment banker, B. Riley Securities, Inc. ("B.

Riley"), determined that none of the initial offers were Qualified Bids[1] and determined to cancel the auction. Accordingly, Debtor negotiated with interested parties and, in consultation with the Bond Trustee and B. Riley, reached an agreement with the <u>Authority</u>, subject to Court approval, to sell certain of its assets to the Authority. A true and correct copy of the proposed Asset Purchase Agreement submitted for approval by the Court is attached hereto as **Exhibit "1"**.

This the 8th day of September, 2023.

/s/ Jonathan A. Akins
JOHN A. CHRISTY
Georgia Bar No. 125518
jchristy@swfllp.com
JONATHAN A. AKINS
Georgia Bar No. 472453
jakins@swfllp.com

Attorneys for Debtor

SCHREEDER, WHEELER & FLINT, LLP
1100 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309-4516
Tel: (404) 681-3450
Fax: (404) 681-1046

---

[1] Capitalized terms have the same definition as in the Sale Procedures Order unless otherwise stated.

**EXHIBIT "1"**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is effective as of the ___ day of September, 2023 (the "**Effective Date**"), by and among the Solid Waste Disposal Authority of the Cities of Muscle Shoals, Sheffield, and Tuscumbia, Alabama, an Alabama public corporation (the "**Buyer**") and CWI Cherokee LF, LLC, an Alabama limited liability company ("**Seller**"). Buyer and Seller are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

RECITALS

A.  Seller and its Affiliates identified herein are engaged in the waste management and post-disposal business (the "**Business**") in Alabama.

B.  Seller has filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division (the "**Bankruptcy Court**"), specifically Case No. 23-52262 (the "**Bankruptcy Case**").

C.  The Bankruptcy Court has approved certain procedures through which Seller may market and sell its assets, as further described in that certain *Order on Debtor's Motion to Sell Assets Free and Clear of Liens, Claims, and Encumbrances, Directing Bidding Procedures, and Setting Preliminary and Final Hearings* (the "**Sale Procedures Order**").

D.  This Agreement is subject to approval by the Bankruptcy Court, including as set forth in the Sale Procedures Order.

E.  Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, pursuant to the terms and conditions of this Agreement, the assets set forth in this Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals, which are incorporated herein, and the mutual promises contained herein, the Parties hereby agree as follows:

1.  **PURCHASE OF ASSETS.**

1.1. <u>Transferred Assets.</u> In accordance with the terms and conditions set forth in this Agreement, Buyer shall purchase and acquire from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all rights, title and interest in and to all the assets and property comprising the Business (except for the Excluded Assets as defined below), as set forth on **Exhibit A**, free and clear of all liabilities, mortgages, liens, security interests, pledges, charges and other encumbrances of any kind or nature (collectively, the "**Transferred Assets**"). The Transferred Assets shall include the following:

(a) All of Seller's rights, title, and interest as lessee or sublessee of that certain real property as more fully identified on **Exhibit A-1** (the "**Transferred Real Property**"), pursuant to the lease set forth in **Exhibit A-2** (collectively, the "**Lease**"), which includes the Cherokee Landfill and the Shoals Transfer Station and <u>excludes</u> the Huntsville Transfer Station;

- 2 -

(b) All furniture, machinery, equipment, tools and vehicles as set forth in **Exhibit A-3** (collectively, the "**Equipment**"), which is either owned or leased by Seller and is located on or with respect to the Transferred Real Property and is necessary for the operation of the Transferred Assets;

(c) All of Seller's interest in business licenses and operating permits, including all environmental and discharge permits relative to the Transferred Assets, as well as all engineering or related operational work product, designs, and plans relative to the Transferred Real Property, whether for actual or potential past, present, or future use (collectively, the "**Permits**");

(d) Those contracts and agreements set forth in **Exhibit A-4** (collectively, the "**Assumed Contracts**"). All contracts, accounts and agreements which are not explicitly purchased and assumed shall hereinafter be referred to collectively as the "**Excluded Contracts**";

(e) All rights, claims, damages, and causes of action of Seller, including without limitation any causes of action under Chapter 5 of the Bankruptcy Code, against or with regard to, any of the following: Caterpillar Financial Services; Evergreen Environmental; ISCO Industries, Inc.; JLW Contracting LLC; MidSouth Septic; P&F Industrial Enterprises; Sibley Oil; Thompson Tractor Co., Inc.; Vulcan; and Waste Connections.

1.2. <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained in Section 1.1, the term Transferred Assets shall not include, and Seller shall retain title to, all of the following assets (collectively "**Excluded Assets**"): (1) all cash of Seller (which excludes any right, title, or interest in or to the Reserve Fund under the Indenture); (2) all accounts receivable of Seller other than any accounts receivable related to or arising from Assumed Contracts that are outstanding after the Approval Date; (3) the corporate seals, minute books, tax returns, books of account and other records having to do with the organization of Seller; and (4) any furniture, fixtures, machinery, equipment, tools or vehicles of Seller not located on or not necessary for the operation of the Transferred Assets that is not Equipment; (5) all equipment of the Seller subject to leases or other financing arrangements that is not Equipment; and (6) any Excluded Contracts.

1.3. <u>Approval Order by Bankruptcy Court</u>.  Buyer acknowledges that Seller's Bankruptcy Case is currently pending in the Bankruptcy Court and this Agreement is subject to approval by the Bankruptcy Court, pursuant to the Approval Order approving the sale of the Transferred Assets under the terms and conditions of this Agreement, as it may be amended.

1.4. <u>Reserved.</u>

1.5. <u>Assumption of Liabilities.</u>  As of the Closing Date, Buyer shall assume, and become solely responsible only for those liabilities arising under the Assumed Contracts as set forth in **Exhibit A-4** (collectively the "**Assumed Liabilities**"). Other than these Assumed Liabilities, Buyer shall not assume or become obligated to perform, without limitation, any liabilities or obligations of Seller, whether known or unknown, relating to the ownership or operation of the Transferred Assets or any other assets of Seller, or the conduct of Seller prior to the Closing Date or any liabilities or obligations of Seller relating to events occurring or existing prior to the Closing Date or which result from or arise out of any action or inaction prior to the Closing Date of Seller which shall remain the responsibility of and shall be retained, paid, performed and discharged solely by Seller.

- 3 -

1.6. <u>No Successor Liability.</u>  The Parties intend that, to the fullest extent permitted by law (including under section 363(f) of the Bankruptcy Code), upon the Closing, the Buyer shall not be deemed to: (a) be the successor of Seller, (b) have, de facto or otherwise, merged with or into Seller, (c) be a mere continuation or substantial continuation of Seller, or (d) be liable for any acts or omissions of Seller in the conduct of the Business or arising under, or related to, the Transferred Assets, other than as expressly set forth in this Agreement and the Approval Order.  The Parties acknowledge and agree that the Agreement was subject to arm's-length negotiation by Buyer and Seller.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement and the Approval Order, the Parties acknowledge and agree that the Buyer shall not be liable for any liabilities, obligations, mortgages, liens, security interests, pledges, charges and other Encumbrances of any kind or nature (other than Assumed Liabilities) against the Seller or any of the Seller's predecessors or affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets, or any liabilities of the Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 1.6 shall be reflected in the Approval Order.

2. **CONSIDERATION.**

2.1 <u>Purchase Price.</u>  The purchase price (the "**Purchase Price**") for the Transferred Assets shall consist of the following:

(a) $3,100,000.00 in immediately available funds which includes the earnest money deposits, as consideration for the execution and delivery of the Joint Release by the Seller and the Seller Related Parties, payable at Closing by wire transfer pursuant to wire instructions to the escrow account of Seller's counsel and earmarked solely for payment of the Guaranteed Claims;

(b) $580,000.00 in immediate available funds for the release by the holders of the Secured Equipment Claims of liens and encumbrances on the Equipment, payable at Closing by wire transfer pursuant to wire instructions to the escrow account of Seller's counsel and earmarked solely for payment of the Secured Equipment Claims.

(c) satisfaction of the 2020 Bond Obligations from the proceeds of the 2023 Bond Refunding, payable to the Trustee;

(d) satisfaction of the Buyer's Cure Costs (which according to a cure notice filed by Buyer in the Bankruptcy Case on July 11, 2023 were a minimum of $2,824,618.92 as of certain dates prior to July 11, 2023) from the proceeds of the 2023 Bond Refunding;

(e) once the 2023 Bond Refunding is closed, payment of $1,200,000.00 for the Administrative Expenses out of the Reserve Fund;

(f) the release of the Buyer's and Buyer Related Parties' claims against the Seller and Seller Related Parties pursuant to the Buyer's and Buyer Related Parties' execution of the Joint Release attached hereto as **Exhibit D**;

- 4 -

(g) assumption of Seller's obligations under the Assumed Contracts including without limitation any cure amounts and Seller's liability for any claims filed or asserted in the Bankruptcy Case based on the Assumed Contracts, provided, however, that Buyer shall have no obligation to immediately pay any cure amount on the P&F Royalty Agreement or bring all payments due thereunder current and Seller shall have no remaining obligations under the same, and provided, further, that any obligation under the P&F Royalty Agreement shall be subordinate to the 2020 Bond Obligations; and

(h) assumption of Seller's outstanding obligations to the Shoals Solid Waste Disposal Authority for Seller's purchase or lease of a Caterpillar 826 Compactor (Serial No. CAT0826KTZ3206415), including without limitation any cure amounts and Seller's liability for any claims filed or asserted in the Bankruptcy Case based on said purchase or lease but not including any obligation to immediately pay any cure amount or bring all payments due under said purchase or lease current.

2.2 <u>Allocation.</u>  Allocation of the Purchase Price among the Transferred Assets, in accordance with Section 1060 of the Internal Revenue Code shall be as indicated in **Exhibit C** hereto. Such allocation shall be utilized by the Parties in preparing and filing all relevant federal and state tax returns, and the Parties agree to cooperate with each other in good faith in preparing such tax returns and forms, including IRS Form 8594 and any required exhibits (or other forms required pursuant to Section 1060 of the Internal Revenue Code or other applicable tax laws). In addition, each Party hereto agrees to notify the other Party in the event any taxing authority takes or purports to take a position inconsistent with the agreed-upon allocations. Buyer shall be entitled to deduct and withhold from the Purchase Price all taxes that Buyer may be required to deduct and withhold under any applicable tax law.

2.3 <u>Transactional Expenses.</u>  Each Party shall bear their own legal and other professional expenses. Except as otherwise provided herein, all expenses shall be borne by the party incurring such expense.

2.4 <u>Expense Apportionments.</u>  Any prepaid items, real property or personal property taxes, and other similar items shall be prorated as of the Approval Date on the basis of the proportional number of days in the relevant determination period for such items, allocated to Seller for all days prior to the Approval Date, and to Buyer for all days on and after the Approval Date. To the extent known prior to the Closing Date, such amounts shall be apportioned as of the Approval Date and the net amount thereof shall be properly reflected on a statement executed at the Closing (the "Closing Statement") and added to or deducted from, as the case may be, the Purchase Price.  Any such amounts which are not known or available for proration on the Closing Date shall be paid by Buyer to Seller, or Seller to Buyer, as applicable, as soon as practicable after such amount becomes available, but in no event later than ninety (90) days after the applicable tax year that overlaps the Closing Date.

2.5 <u>Deposit.</u>  Buyer made an initial earnest money deposit of $50,000 as required by the Sale Procedures Order on July 26, 2023 and a supplemental earnest money deposit of $279,000 in the same manner on September 11, 2023.  Disposition of such earnest money shall be applied to the Purchase Price and as provided in the Sale Procedures Order.

2.6 <u>Buyer's Operational Control Prior to Closing.</u>  Upon the entry of the Approval Order and through Closing or termination of this Agreement, Buyer shall take operational control of the Transferred Assets and shall be responsible for all costs and expenses of operation of the same including without limitation equipment costs, insurance, payments on the Assumed Contracts and Lease, and taxes. For the avoidance of doubt, all income and expenses incurred prior to the Approval Date, if any, shall be for the account of the Seller and those incurred after the Approval Date, if any, shall be for the account of the Buyer, and Buyer shall indemnify and hold Seller harmless from all claims arising from such operational control after the Approval Date but before the Closing Date.  The Buyer shall take no action which will create any liability for Seller  and shall maintain general liability insurance with commercially reasonable limits and coverage consistent with the operation of the Transferred Assets and name the Seller as an additional insured.  Buyer shall copy Seller with all communications with ADEM.

3. **REPRESENTATIONS AND WARRANTIES OF SELLER**

As a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, Seller represents and warrant to Buyer as follows:

3.1. <u>Corporate Status.</u>  Seller is duly organized, validly existing and in good standing under the laws of the State of Alabama. Seller has all requisite power to own or lease the Transferred Assets and to carry on its business in the manner and in the place where such Transferred Assets are owned, leased or operated.

3.2. <u>Authority for Agreement; Consents.</u>  Seller has full right, power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes a valid agreement, binding upon and enforceable against Seller in accordance with its terms. The execution, delivery and performance by the Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Transferred Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party or to which any of the Transferred Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Transferred Assets. Other than approval by the Bankruptcy Court, no consent, approval, waiver or Authorization is required to be obtained by Seller from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby.

3.3. <u>Title to Transferred Assets; Condition.</u>  Seller owns or leases, and possesses good and transferable title to the Transferred Assets.  It is the intent of the parties that such Transferred Assets will be conveyed free and clear of all encumbrances and liens against the Transferred Assets pursuant to the Approval Order.  The Transferred Assets are all now in the possession of Seller and no other Person has a right to possession of, or claims possession to, all or any part of the Transferred Assets. The Transferred Assets are being sold on an "as-is, where-is" basis. Seller makes and shall make to the Buyer no warranty regarding the Transferred Assets of any nature, kind, or character

- 6 -

whatsoever, either expressed or implied, including without limitation, any warranty as to (i) the quality, nature, adequacy, and physical condition of the Transferred Assets, (ii) the quality, nature, adequacy, and physical condition of soils, geology, and any groundwater, (iii) the existence, quality, nature, adequacy, and physical condition of utilities serving the Transferred Real Property, (iv) the development potential, or income potential of the Transferred Assets, (v) the Transferred Assets' value, use, habitability, or merchantability, (vi) the fitness, suitability, or adequacy of the Transferred Assets for any particular use or purpose, (vii) the zoning or other legal status of the Transferred Assets or any other public or private restrictions on the use of the Transferred Assets, (viii) the compliance of the Transferred Assets or their operation with all applicable codes, laws, rules, regulations, statutes, ordinances, covenants, judgments, orders, directives, decisions, guidelines, conditions, and restrictions (collectively, the "Laws") of any governmental or quasi-governmental entity, (ix) the quality of any labor and materials used in any improvements included in the Transferred Assets, (x) the freedom of the Transferred Assets, including all improvements located thereon, from vices or defects, and (xi) the freedom of the Transferred Assets from either latent or apparent defects..

3.4. <u>Lease.</u>  As listed on **Exhibit A-2** attached hereto, the Buyer has received (i) complete copies of the Lease and all subsequent amendments, modifications and related documents (including without limitation rent commencement letters) and (ii) a copy of all permits, approvals, and certificates of occupancy for the Improvements at the Transferred Assets and a copy of any variance granted with respect to the Transferred Assets pursuant to applicable zoning laws or ordinances, all of which documents are true and complete copies thereof as in effect on the date hereof. Except as disclosed in the Bankruptcy Case or otherwise disclosed to Buyer, including all enforcement actions of ADEM, Seller has not received any notice from any governmental agency, board, bureau, body, department or authority of any jurisdiction, with respect to the use or condition of any Transferred Real Property.

3.5. <u>Assumed Contracts.</u>  The Assumed Contracts to be assumed hereunder by Buyer are identified in **Exhibit A-4** and are (i) all of the contracts to be assumed by Buyer; (ii) complete with all amendments and modifications thereto. Seller shall be solely responsible for the termination of any contracts which are not Assumed Contracts.

3.6. <u>Broker.</u>  Except for B. Riley Securities, Inc., Seller has not contracted with, or made any promise to, any broker, finder, agent or other party for the payment of any fee or commission with respect to the transactions contemplated by this Agreement.

3.7. <u>Insurance Through Approval Date.</u>  Seller maintains through the Approval Date such policies or binders of fire, casualty, liability, and other forms of insurance with regard to the operation of the Transferred Assets as required by the Lease between the Buyer and Seller, in such amounts with such deductibles and against such risks and losses as are sufficient for compliance with law and all agreements to which Seller is a party, and which are customary and reasonable for the assets and operations of Seller, including the Transferred Assets (the "**Insurance Policies**").

3.8. <u>Litigation Affecting Title.</u>  To the knowledge of Seller, except for the Bankruptcy Case, or as otherwise disclosed in the Bankruptcy Case or to Buyer, there are no Proceedings pending or threatened against or affecting title to any of the Transferred Assets.

3.9. <u>Environmental Matters.</u>

(a) Buyer is aware of the Cease and Desist Order and certain notices of violation issued by ADEM, including without limitation the notice of violation issued by ADEM on July 12, 2023, and the issues and proceedings referred to therein.  Except as disclosed, to the knowledge of Seller and any action of ADEM, Seller is currently not in material violation of applicable Environmental Laws and each material term and condition of any Authorization issued under Environmental Law.  To the extent relating to Environmental Laws and except as disclosed to Buyer, Seller has not received any written or oral notification from any Person, other than ADEM, of any: (i) Environmental Claim; or (ii) any request for information pursuant to Environmental Laws or a term or condition of an Authorization issued in accordance with an Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.  Except as disclosed or which Buyer has knowledge, to the knowledge of Seller, all past non-compliance with Environmental Laws or Authorizations have been resolved without ongoing obligations or costs.

(b) To the knowledge of Seller and except as disclosed in Schedule 3.9(a), there is not currently, and there has never been within the last five (5) years any underground storage tank located at any Transferred Real Property.

(c) To the extent available to Seller or in Seller's possession or control, full and complete copies of all reports, studies, audits, records, sampling data, site assessments, and other similar documents, and all environmental insurance policies, relating to the environmental condition of, environmental compliance associated with, or insurance coverage concerning the Business, the Transferred Assets, and the Transferred Real Property have or will have been provided to Buyer on or before Closing.

3.10.  <u>Employment Matters.</u>

Buyer shall not have any liability or obligations to contribute to any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms were expressly defined in Section 3(1) and 3(2) of ERISA (collectively, the "Employee Welfare Plans"), including a "multiemployer plan" (as defined in Section 3(37) of ERISA) for any independent contractors or employees, professionals or nonprofessionals (collectively, the "Personnel") utilized in the Business. Buyer shall not have any liability for any retirement or deferred compensation plan, incentive compensation plan, stock plan, unemployment compensation plan, vacation pay, severance pay, bonus or benefit arrangement, insurance hospitalization program, or other material fringe benefit arrangements (herein referred to collectively as "Employee Fringe Benefit Arrangements") for any Personnel utilized in the Business that arose during or out of Seller's operation of the Business.

3.11.  <u>Real Property Matters.</u>

(a) **Exhibit A-1** sets forth an accurate and complete list of the addresses, parcel numbers, uses, and record owners of all Transferred Real Property in which Seller holds a valid and subsisting leasehold interest and to the Transferred Real Property pursuant to the applicable Lease. Seller is presently in sole possession of the Transferred Real Property and is exclusively entitled to

- 8 -

all rights and benefits as lessee under the Lease. Seller has not leased, sublet, assigned, licensed or otherwise conveyed any rights in the Transferred Real Property to any other Person.

(b) Upon request Seller will provide to Buyer a true and complete copy of each title insurance commitment or title insurance policy, each real property survey or plat applicable, and all variances, special use permits, or other land use entitlement documents in the possession of Seller and applicable to the Real Property.

(c) Except as disclosed directly to Buyer or included in or as part of all bankruptcy schedules and filed claims in the Bankruptcy Case, to the knowledge of Seller all amounts for labor and materials relating to the construction and repair of the Improvements on the Transferred Real Property have been paid in accordance with contractual arrangements therefor and no one has a right to file a construction, builders', mechanics' or similar lien in respect of the payment of such amounts under any applicable Law with respect to the Transferred Real Property.

(d) To the knowledge of Seller, there is no condemnation, expropriation or other Proceeding in eminent domain, pending, affecting or, to the knowledge of the Seller, threatened, against any of the Transferred Real Property or any portion thereof or interest therein.

3.12. Taxes.

(a) Except for tax year 2022, Seller has timely filed, or obtain extension for timely filing of, all local, state, and federal tax returns and paid all amounts due and owed thereunder and is not presently subject to any tax inquiries, proceedings, or notices of unpaid taxes of any kind, unless otherwise disclosed to Buyer.

(b) The Transferred Assets are not subject to and have no outstanding local, state, or federal tax liens, notices, or encumbrances which will not be divested by the Approval Order.

(c) All withholding payments and other employment related taxes or obligations of the Seller are current and paid.

4. **REPRESENTATIONS AND WARRANTIES OF BUYER**

As a material inducement for the Company to enter into and perform its obligations under this Agreement, Buyer hereby represents and warrants to the Seller as follows:

4.1. Corporate Status. The Buyer is a duly organized, validly existing and in good standing as a public corporation under the laws of the State of Alabama.

4.2. Authority for Agreement. The Buyer has full right, power and authority to enter into this Agreement and to perform its obligations hereunder. This Agreement constitutes a valid agreement, binding upon and enforceable against Buyer in accordance with its terms. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law,

- 9 -

ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or Authorization is required to be obtained by Buyer from any person or entity (including any Governmental Authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

4.3. <u>Full Disclosure.</u>  No representation made by Buyer in this Agreement, in any schedule or exhibit hereto, in any certificate, document or agreement delivered in connection herewith, contains or will contain any misrepresentation of a material fact or omits or will omit any material fact necessary to make the statements herein or therein not misleading. Documents delivered or to be delivered by Buyer pursuant to this Agreement are or will be true and complete copies of what they purport to be.

4.4. <u>No Broker.</u>  Except as may be set forth in the Sale Procedures Order, Buyer has not contracted with, or made any promise to, any broker, finder, agent or other party for the payment of any fee or commission with respect to the transactions contemplated by this Agreement.

5. **COVENANTS.**

5.1. <u>Seller Covenants.</u>  From and after the Effective Date, Seller agrees:

(a)   to maintain the insurance required on all Transferred Real Property and Transferred Assets at all times until the Approval Date; and

(b)   to grant Buyer and/or Buyer's representatives full access during the Due Diligence Period (at reasonable times and upon reasonable advance notice) to all Transferred Real Property, data, documents, and other records relating specifically to the Business (including all financial and operational records), Transferred Real Property, and Transferred Assets for the purpose of performing such inspections as Buyer deems necessary to conduct Buyer's due diligence.

5.2. <u>Seller's Employees.</u>  Upon receipt of the Approval Order, or upon Seller's written consent, Buyer may, but is not obligated to, offer employment to Seller's employees associated with the Business.

6. **CONDITIONS PRECEDENT TO CLOSING**

6.1. <u>Conditions of Seller's Obligation.</u>  Seller's obligation to consummate the transactions contemplated by this Agreement is subject to satisfaction or Seller's waiver of the following conditions on or prior to the Closing Date:

(a)  Buyer shall have, in all material respects, performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by Buyer prior to or on the Closing Date, and at the Closing, Buyer shall have delivered to Seller a certificate to such effect signed by an authorized officer of Buyer (the "**Buyer's Bring-Down Certificate**");

(b)  Buyer's representations and warranties contained herein shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date as if then made (or to the extent such representations and warranties speak as of a specified date, they need only be true and correct in all respects as of such specified date),

- 10 -

except for changes permitted or contemplated by the terms of this Agreement, and at the Closing, Buyer shall deliver the Buyer's Bring-Down Certificate to Seller certifying to such effect;

(c) Except for objections that have been overruled by the Bankruptcy Court, withdrawn, or consensually resolved since the Effective Date, there shall not have been commenced or threatened against Seller any Proceeding (i) involving any challenge to, or seeking damages or other relief in connection with this Agreement or the Transactions; or (ii) that has the effect of materially preventing, delaying, making illegal, imposing limitations or conditions on or otherwise materially interfering with any of such transactions.

(d) There shall be no preliminary or permanent injunction or other Order in existence that prohibits the consummation of the sale of the Transferred Assets or the other Transactions; and

(e) The Bankruptcy Court shall have entered the Approval Order and such Approval Order shall be effective and not subject to any stay pending appeal and the stay provided by Bankruptcy Rule 6004(h) shall have expired or been rendered inapplicable by the terms of the Approval Order.

(f) Written confirmation from Buyer and P&F Industrial Enterprises, Inc., reasonably satisfactory to Seller, that Stephen E. Witmer has no and is released from any personal liability, guaranty or obligations pursuant to the P&F Royalty Agreement.

(g) Execution by the Buyer and the Buyer Related Parties of the Joint Release attached here as **Exhibit D** and incorporated herein by reference, which Joint Release shall not become effective until the successful completion and consummation of the Closing.

(h) Evidence reasonably satisfactory to Seller that the State Court Lawsuit has been dismissed without prejudice and will be dismissed with prejudice on or before the date that is ten (10 days after the Closing Date.

6.2. <u>Conditions of Buyer's Obligation.</u>    Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to satisfaction or Buyer's waiver of the following conditions on or prior to the Closing Date:

(a) Seller shall have, in all material respects, performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by Seller prior to or on the Closing Date, and at the Closing, Seller shall have delivered to Buyer a certificate to such effect signed by an authorized officer of Seller (the "**Seller's Bring-Down Certificate**"),

(b) Seller's representations and warranties contained herein shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date as if then made (or to the extent such representations and warranties speak as of a specified date, they need only be true and correct in all respects as of such specified date), except for changes permitted or contemplated by the terms of this Agreement, and at the Closing, Seller shall deliver the Seller's Bring-Down Certificate to Buyer certifying to such effect,

- 11 -

(c) [Reserved];

(d) Except for objections that have been overruled by the Bankruptcy Court, withdrawn, or consensually resolved since the Effective Date, there shall not have been commenced or threatened against Buyer any Proceeding (i) involving any challenge to, or seeking damages or other relief in connection with this Agreement or the Transactions; or (ii) that has the effect of materially preventing, delaying, making illegal, imposing limitations or conditions on or otherwise materially interfering with any of such transactions;

(e) Execution of all necessary documents in Buyer's discretion to effectuate the release and/or assignment to Buyer of the rights, claims, and causes of action referenced in section 1.1(f);

(f) There shall be no preliminary or permanent injunction or other Order in existence that prohibits the consummation of the sale of the Transferred Assets or the other Transactions; and

(g) The Bankruptcy Court shall have entered the Approval Order and such Approval Order shall be effective and not subject to any stay pending appeal and the stay provided by Bankruptcy Rule 6004(h) shall have expired or been rendered inapplicable by the terms of the Approval Order.

(h) Execution by the Seller and the Seller Related Parties of the Joint Release attached here as **Exhibit D** and incorporated herein by reference, which Joint Release shall not become effective until the successful completion and consummation of the Closing.

## 7. <u>**ADDITIONAL CONDITIONS OF BUYER'S OBLIGATIONS**</u>.

7.1  Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to satisfaction of the following conditions on or prior to the Closing Date:

(a) Termination of the Project Management Agreement dated June 23, 2020 between the Seller and CWI Enterprises, LLC for the operation of the Cherokee Landfill.

(b) The approval of the 2023 Bond Refunding by the Buyer and each of the Cities of Muscle Shoals, Sheffield, and Tuscumbia, Alabama.  Notwithstanding anything to the contrary in the Approval Order or the Agreement, Trustee's liens may not be released, impaired, or affected prior to Closing, consummation of the 2023 Bond Refunding and satisfaction of the 2020 Bond Obligations; provided for the avoidance of doubt, that the Trustee's liens and claims shall attach and be payable from proceeds of the 2023 Bond Refunding.

(c) Evidence reasonably satisfactory to Buyer that all liens, security interests, and encumbrances on the Equipment have been or will be released on or before thirty (30) days after the Closing Date.

(d) The approval of the Joint Release by the Buyer Related Parties.

(e) Provisions in the Approval Order that state:

- 12 -

(i)   $3,100,000.00 of the Purchase Price shall be used exclusively to pay the Guaranteed Claims, unless the Guaranteed Claims do not exceed $3,100,000.00.

(ii)   $580,000.00 of the Purchase Price shall be used exclusively to pay the Secured Equipment Claims, unless the Secured Equipment Claims do not exceed $580,000.00.

(iii)   Any amounts left over after payment in full of the Guaranteed Claims and the Secured Equipment Claims shall be used first to pay any Administrative Expenses as of the Closing Date that remains unpaid after payment of the $1,200,000.00 from the Reserve Fund to Administrative Expenses (as detailed below) and second to pay nonpriority unsecured claims of the Seller's bankruptcy estate.

(iv)   $1,200,000.00 shall be transferred from the Reserve Fund once the 2023 Bond Refunding is closed to pay Administrative Expenses at Closing.

(v)   So long as Buyer assumes operational control of the Transferred Assets in accordance with Section 2.6, the automatic stay under section 362(a) of the Bankruptcy Code shall be immediately lifted on the Approval Date without stay to allow Buyer to access and take operational control of the Transferred Assets including without limitation all actions by Buyer that it deems reasonably necessary in its sole and complete discretion to comply with the Cease and Desist Order and operate the Cherokee Landfill upon ADEM's lifting of the Cease and Desist Order, if applicable.

(vi)   In no event shall the Trustee's liens be released, impaired, or affected prior to Closing and consummation of the 2023 Bond Refunding and satisfaction of the 2020 Bond Obligations; provided for the avoidance of doubt, that the Trustee's prepetition liens shall attach and be payable from proceeds of the 2023 Bond Refunding; provided, further, that Trustee shall release, terminate and cancel the Negative Pledge Agreement dated June 23, 2020 between Seller, CWI Transfer HSV, LLC and Regions Bank as trustee upon Closing and consummation of the 2023 Bond Refunding.

(vii)   All liens, security interests, and encumbrances on the Equipment shall be released on or before thirty (30) days after the Closing Date, to the reasonable satisfaction of the Buyer.

8. **CLOSING.**

8.1. <u>Closing Date.</u>   Subject to the satisfaction of all conditions precedent, the Parties agree to consummate the transactions described herein on or before the 31st day of October, 2023, or such other date as the Parties and the Trustee may mutually agree (the **"Closing Date"**). Closing shall take place with delivery of all Buyer and Seller deliverables, simultaneously by e-mail on the Closing Date with originals to follow via next carrier or at some other time and place as agreed to by the Parties (the **"Closing"**).

8.2. <u>Closing Deliverables.</u>

(a) By Seller. At Closing, Seller shall sign and deliver the following to Buyer or Buyer's designee:

- 13 -

(i) a Bill of Sale signed by Seller for the Transferred Assets in the form attached hereto as **Exhibit B**,

(ii) all assignable Permit transfers and consents to such transfers as may be required in a form acceptable to Buyer,

(iii) a resolution in accordance with Seller's governing documents duly authorizing the transactions set forth herein in a form acceptable to Buyer,

(iv) such officer's certificates, secretary's certificates, good standing certificates and any other corporate or business documents usual and customary for transactions of this type as reasonably requested by Buyer,

(v) Seller's Bring-Down Certificate, and

(vi) the Joint Release attached hereto as **Exhibit D** and incorporated by reference, executed by Seller and Seller Related Parties.

(b) By Buyer.

(i) payment of the Purchase Price. With respect to the portion of the Purchase Price described in section 2.1(a) and (b) hereof, such payment shall be by way of certified funds, wire or electronic transfer to Seller or Seller's designee.

(ii) a resolution in accordance with Buyer's governing documents duly authorizing the transactions set forth herein in a form acceptable to Seller.

(iii) such officer's certificates, secretary's certificates, good standing certificates and any other corporate or business documents usual and customary for transactions of this type as reasonably requested by Seller.

(iv) Buyer's Bring-Down Certificate.

(v) the Joint Release attached hereto as **Exhibit D** and incorporated by reference, executed by Buyer and Buyer Related Parties.

(vi) written confirmation from Buyer and P&F Industrial Enterprises, Inc., reasonably satisfactory to Seller, that Stephen E. Witmer has no and is released from any personal liability, guaranty or obligations pursuant to the P&F Royalty Agreement.

(vii) written confirmation reasonably satisfactory to Seller that the State Court Lawsuit has been dismissed without prejudice and will be dismissed with prejudice on or before the date that is ten (10 days after the Closing Date.

(c) Mutual Deliverables. Buyer and Seller agree to execute and deliver to one another counterpart originals of:

- 14 -

(i) the Closing Statement in a standard form setting forth the Purchase Price, all apportionments, holdbacks and closing costs as well as the payment and distribution thereof.

(ii) such assignment and assumption agreements pursuant to which Seller assigns and Buyer assumes the role of "tenant" under the Lease (with consents from each Landlord as applicable pursuant to each particular Lease).

(iii) such assignment and assumption agreements pursuant to which Seller assigns and Buyer assumes responsibility for all of the Assumed Contracts (with consents from each third party to such Contract as applicable pursuant to each particular Assumed Contract).

(iv) Such other documents reasonably requested by Seller or Buyer and which are a condition for Buyer to close the Transaction or reasonably necessary to consummate the transactions contemplated by this Agreement.

8.3 <u>Effect of Permit Revocation</u>.  Anything in this Agreement to the contrary notwithstanding, the Buyer shall have no further obligations hereunder, including the obligation to close the 2023 Bond Refunding, if prior to the Closing Date ADEM issues an order or other written communication revoking, rescinding, or invalidating in any way the Buyer's permit for the operation of the Landfill.

8.4 <u>Limitation of Buyer's Liability</u>.  In the event that the Closing does not occur, the Buyer shall have no obligation or liability to the Seller but for the $50,000 earnest money cash deposit heretofore made to Seller on July 26, 2023, as supplemented by the additional $279,000 earnest money cash deposit made on September 11, 2023.

9. **BANKRUPTCY COURT MATTERS**

9.1. <u>Agreement Contingent on Bankruptcy Court Approval.</u>  The Parties hereby acknowledge that this Agreement is subject to approval by the Bankruptcy Court and that receipt of the Approval Order shall be a condition precedent to Closing for all Parties hereunder.

9.2. <u>Bankruptcy Court Filings.</u>

(a) Seller will file with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Approval Order. The Approval Order shall provide that, without limitation and notwithstanding anything to the contrary in this Agreement, Buyer is not liable for, and is taking the Transferred Assets free of any liabilities, obligations, mortgages, liens, security interests, pledges, charges and other Encumbrances of any kind or nature (other than Assumed Liabilities) against the Seller or any of the Seller's predecessors or affiliate.  The Parties shall use reasonable best efforts, and the Parties agree that they will promptly take such actions as are reasonably requested by the other Party, to cooperate, assist and consult with each other to secure the entry of Approval Order and a finding of adequate assurance of future performance by Buyer and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section

- 15 -

363(m) of the Bankruptcy Code and finding that the Approval Order is final upon entry as provided for in Bankr. R. 6004(h).   In the event the entry of the Approval Order, or any other Orders relating to this Agreement, shall be appealed by any person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), the Parties will cooperate in determining and pursuing the response to any such appeal, petition or motion and the Parties shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion. For purposes of this Section 9.2 only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Approval Order by the Bankruptcy Court and resolution of any appeal therefrom.

(b)    The Parties will cooperate in determining and pursuing the response to any such appeal, petition or motion and the Parties shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.   For purposes of this Section 9.2 only, commercially reasonable efforts shall without limitation require each Party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Approval Order by the Bankruptcy Court and resolution of any appeal therefrom.

(c)    From and after entry of the Approval Order until the Closing Date to the extent reasonably practicable, Seller shall deliver to Buyer drafts of any pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with the Agreement, except for those to be filed or submitted in the Bankruptcy Case, and the operation of the Business as may be reasonably necessary for Buyer's prior review and comment at least two (2) business days prior to the filing or submission thereof (provided if it is not practicable to deliver the same within two (2) business days of the filings date as soon as practicable thereafter), and such filings shall be reasonably acceptable to Buyer to the extent related to the Transferred Assets or the Assumed Liabilities, or any of Buyer's obligations hereunder.

9.3. Notice to Holders of Liens, Claims, or Interests.   To ensure that the Approval Order is binding and enforceable against any party with a lien, claim, or interest in or against the Seller or the Transferred Assets, Seller shall provide notice of this Agreement and the Transaction to all holders of any such liens, claims, or interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

9.4. Discharge of Liabilities.   Notwithstanding anything herein to the contrary, other than the Buyer's commitment to pay the Assumed Liabilities, Seller shall be responsible for any obligations, liabilities and claims against Seller, its bankruptcy estate, or the Transferred Assets, whether or not settled, unpaid, paid in full, paid in part, or discharged by action of the Bankruptcy Court, and Seller shall ensure that title to the Transferred Assets passes to Buyer free and clear of any and all such obligations, liabilities, or claims on the terms set forth in the Approval Order.

9.5. Buyer Obligated to Establish Adequate Assurance of Future Performance.   To the extent required by a counterparty as a condition to the assumption and assignment of any Assumed Lease or Assumed Contract, Buyer shall have the responsibility of providing adequate assurance of future performance of such Assumed Lease or Assumed Contract pursuant to 11 U.S.C. § 365(b)(1)(C).

- 16 -

10. **PROVISIONS RELATED TO REAL PROPERTY MATTERS**

10.1. Survey.  Seller shall provide Buyer with any existing survey(s) of the Transferred Real Property currently in its possession. Any new survey required by Buyer (the **"Survey"**) shall be at Buyer's expense.

10.2. Title Insurance.  At Closing, to the extent applicable, all expenses for any owner's and/or lender's title insurance policy shall be borne by Buyer.

10.3. Recording Fees; Expenses.  With respect to the Transferred Real Property, to the extent applicable, Buyer shall pay and be responsible for all costs, fees and expenses including but not limited to the following items: (i) all fees for any title commitment; (ii) the costs to prepare any deeds, assignments, terminations or other documents to be filed in the local real property recording office; (iii) the issuance of any owner's and/or lender's title insurance policy; (iv) the costs of any Survey; and (v) all other costs related to the closing of the Transferred Real Property not otherwise apportioned in this Agreement.

11. **REMEDIES**

11.1.    Survival.

The representations and warranties contained in this Agreement shall survive the Closing and continue in full force and effect for a period of twenty-four (24) months after the Closing Date, except that:

(a) the representations and warranties given by Seller in Section 3.1 (Corporate Status), Section 3.2 (Authority for Agreement; Consents) and Section 3.6 (Brokers) (together, the **"Fundamental Representations and Warranties"**) shall survive and continue in full force and effect without limitation of time;

(b) the representations and warranties set out in Section 3.9 (Environmental Matters) shall survive and continue in full force and effect for a period of five (5) years following the Closing;

(c) the representations and warranties set out in Section 3.12 (Taxes) shall survive and continue in full force and effect until the expiration of the applicable statute of limitations (which shall take into account any tolling periods and other extensions); and

(d) Any representation and warranty involving fraud or intentional misrepresentation by the Party giving that representation and warranty shall survive and continue in full force and effect without limitation of time.

All claims for breach of representation and warranty must be asserted in writing within the applicable survival period.

11.2.    Claims Procedure.

(a) Whenever any claim for Damages is made, the Party seeking damages will promptly provide written notice of the claim to the other Party and, when known, the facts constituting the basis for such claim. If any such claim for Damages results from or is in connection with any claim

- 17 -

or legal Proceedings by a third party (a "**Third Party Claim**"), the notice will be accompanied by a true and complete copy of such Third Party Claim.

(b) If, within thirty (30) days after the notice of dispute is given, the Parties are unable to agree upon a settlement of the dispute, any Party may submit the dispute to a court of competent jurisdiction in accordance with this Agreement.

12. **DEFINITIONS**

For purposes of this Agreement, capitalized terms not otherwise defined herein shall have the following meanings:

"**2023 Bond Refunding**" means the Buyer's advance refunding of the 2020 Bond Obligations in full on the Closing Date with the proceeds of the Buyer's Taxable Revenue Bonds, Series 2023, to be dated the date of delivery, by depositing the proceeds into an escrow account held by the Trustee of the Series 2020 Bonds in an amount sufficient to pay the 2020 Bond Obligations. The Trustee shall have a valid, perfected lien on the amounts deposited in the escrow account until the Series 2020 Bonds are fully refunded.

"**2020 Bond Obligations**" means all obligations due and owing under the Series 2020 Bonds and the Indenture, including all Trustee fees, the fees of the Trustee's professionals, costs, indemnities, charges, the Optional Redemption Price as defined in the Indenture on May 1, 2025, debt service through May 1, 2025, and other amounts set forth therein.

"**ADEM**" means the Alabama Department of Environmental Management.

"**Administrative Expenses**" means the actual, necessary costs and expenses of preserving the Seller's bankruptcy estate pursuant to section 503(b)(1) and other sections of the Bankruptcy Code, as allowed and determined payable by the Bankruptcy Court.

"**Affiliate**" means with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person with the terms "control" and "controlled" meaning for purposes of this definition the power to direct the management and policies of a Person, directly or indirectly, whether through ownership of voting securities or partnership or other ownership interests, by agreement, oral or in writing, or otherwise, and "affiliate" as defined under the Bankruptcy Code.

"**Approval Date**" means the date the Approval Order is entered.

"**Approval Order**" shall be an Order of the Bankruptcy Court, entered on or before September 15, 2023, in a form and substance reasonably acceptable to Seller, Trustee, and Buyer, in Buyer's discretion, and that contains at least the following: (i) authorization and approval of (a) the consummation of the Transactions contemplated by this Agreement on the terms and conditions set forth herein and (b) the assumption and assignment of the Assumed Contracts to the Buyer and (ii) findings of fact, conclusions of law and ordering provisions that (a) the consummation of the Transactions contemplated by this Agreement on the terms and conditions set forth herein is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including,

without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Transaction, (b) find that pursuant to section 105(a) and 363(f) of the Bankruptcy Code, the sale of the Transferred Assets to Buyer or its designee(s) shall be free and clear of any liens, debts, liabilities, claims, charges, security interests or Encumbrances of any kind whatsoever other than the Assumed Liabilities, (c) find that Buyer is a purchaser of the Transferred Assets in "good faith" pursuant to section 363(m) of the Bankruptcy Code, (d) find that Buyer and Seller did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(m) of the Bankruptcy Code and is final upon entry as contemplated by Bankr. R. 6004(h), (e) find that none of Buyer nor any designee of Buyer is a successor to Seller or the bankruptcy estate by reason of any theory of Law or equity, and none of the Buyer nor any designee of Buyer shall assume or in any way be responsible for any liability of Seller or its bankruptcy estate, except as otherwise expressly provided in this Agreement, (f) find that the form of any and all notices related to this Agreement and the Transaction was adequate and reasonable under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any other applicable law and that no further notice to any person is necessary for a finding that the sale of the Transferred assets free and clear of any liens, debts, liabilities, claims, charges, security interests or encumbrances of any kind whatsoever other than the Assumed Liabilities; (g) find that the form of any and all notices related to the assumption and assignment of any contracts or leases was adequate and reasonable under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any other applicable and no further notice to any counterparties to such contracts or leases is necessary, (h) find that each of the counterparties to the Assumed Contracts was given adequate notice of Seller's proposed assumption thereof and the terms of such assumption, and (i) determines the final amount of Cure Costs for each of the Assumed Contracts.

"**Authorization**" means a license, permit, approval, consent, certificate, registration or authorization including those made or issued by a Governmental Authority.

"**Business Day**" means any day of the year, other than a Saturday, Sunday or a statutory holiday in the State of Alabama.

"**Buyer Related Parties**" means (i) the City of Muscle Shoals, Alabama; (ii) the City of Sheffield, Alabama; (iii) the City of Tuscumbia, Alabama; and (iv) the Shoals Solid Waste Disposal Authority.

"**Cease and Desist Order**" means the Cease and Desist Order issued by ADEM on February 27, 2023 relating to violations of certain environmental statutes and regulations ADEM observed during inspections of the Cherokee Landfill between December 2022 and March 2023.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Cherokee Landfill**" shall mean the Cherokee Landfill as defined in the Indenture.

"**Closing Date**" shall mean October 31, 2023, or such any other date prior to October 31, 2023, as the Parties and the Trustee may mutually agree.

- 19 -

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate the assumption by the applicable Seller, and the assignment to Buyer, of the Assumed Contracts to which such Seller is party, as determined by the Bankruptcy Court or agreed to by Seller and the non-Seller counterparty to the applicable Assumed Contract.

"**Damages**" means any losses, liabilities, damages, deficiencies, judgments, Taxes, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable legal and professional fees and expenses without reduction for tariff rates or similar reductions), whether resulting from an action, order, suit, Proceeding, arbitration, claim or demand that is instituted or asserted by a third party, including a Governmental Authority, or a cause, matter, thing, act, omission or state of facts not involving a third party.

"**Encumbrance**" means any mortgage, pledge, lien, charge, hypothecation, security interest, encumbrance, adverse right, interest or claim, license, covenant, title defect, option, or right of first refusal.

"**Environmental Claim**" means any action, claim, Proceeding, order by a Governmental Authority, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence, Release of, or exposure to, any Hazardous Substances; or (ii) any actual or alleged non-compliance with any Environmental Law or term or condition of any Authorization issued under Environmental Law.

"**Environmental Laws**" means any applicable Laws relating to pollution, protection of the environment or human health and safety, air emissions, water discharges, or to the extent relating to a Hazardous Substance, including CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and subsequent Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. § 690I et seq. (collectively "RCRA"); the Hazardous Substances Transportation Act, as amended, 49 U.S.C. § 180I et seq. (the "Hazardous Substances Transportation Act"); the Clean Water Act, as amended, 33 U.S.C. § 1311 et seq. (the "Clean Water Act"); the Clean Air Act, as amended, 42 U.S.C. § 7401-7642 (the "Clean Air Act"); the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601 et seq. (the "Toxic Substances Control Act"); the Federal Insecticide, Fungicide, and Rodenticide Act as amended, 7 U.S.C. § 136-136y ("FIFRA"); the Emergency Planning and Community Right-to-Know Act of 1986 as amended, 42 U.S.C. § II 001 et seq. (Title III of SARA) ("EPCRA"), and similar Laws of the State of Alabama relating to the collection, handling, transportation and management of solid waste.

"**Equipment Claims**" means the claims (i) of Komatsu as evidenced by Proof of Claim 18-1 filed in the Bankruptcy Case and (ii) Caterpillar as evidenced by Proof of Claim 27-1 filed in the Bankruptcy Case.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or

- 20 -

any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Guaranteed Claims**" means (i) the claims of 10 Kings LLC, Bill Cohen, Brickstone Fund, Derek Griffin, Marshall Roberts, and Todd Moreland against the Seller's bankruptcy estate that the Seller scheduled in filings in the Bankruptcy Case, (ii) the claims of A.J. Equity Group LLC, Fundamental Capital SPE, and Wesley Shafto against the Seller's bankruptcy estate as evidenced by Proofs of Claim 5-1, 20-1, and 22-1 filed in the Bankruptcy Case; (iii) the Smith Claim; (iv) the unsecured portion of the Equipment Claims.

"**Hazardous Substances**" means: chemicals, materials, wastes or substances listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," a "contaminant," a "pollutants," "infectious wastes," "medical wastes," "radioactive wastes," or words of similar import under any applicable Environmental Law.

"**Huntsville Transfer Station**" means the Huntsville Transfer Station as defined in the Lease.

"**Indenture**" means the Trust Indenture dated June 23, 2020, by and between the Buyer and Regions Bank, as original trustee, pursuant to which the Buyer issued $14,100,000 Solid Waste Disposal Revenue Bonds (Cherokee Industrial Landfill Project) Series 2020-A and $4,530,000 Taxable Solid Waste Disposal Revenue Bonds, Series 2020-B.

"**Improvements**" means all buildings, structures, erections, improvements, fences, gates, roadways, driveways, parking areas, curbs, gutters, surface water or ground water collection, filtration, retention and drainage structures, gas, electricity, sanitary sewer or other utility infrastructure, fixtures (including fixed machinery and fixed equipment), and other appurtenances situate on or under or forming a part of any of any Transferred Real Property.

"**Joint Release**" means the release attached hereto as **Exhibit D**.

"**Law**" or "**Laws**" means any and all applicable (i) laws, constitutions, treaties, statutes, codes, ordinances, orders, decrees, rules, regulations and by-laws (ii) judgments, orders, writs, injunctions, decisions, awards and directives of any Governmental Authority and (iii) to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Authority.

"**Lease**" means the Lease Agreement dated June 23, 2020 between the Buyer and the Seller.

"**Order**" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination, settlement or award entered by or with any Governmental Authority.

"**P&F Royalty Agreement**" means the Amended and Restated Royalty Agreement dated December 15, 2019 between P&F Industrial Enterprises, Inc., and CWI Alabama, LLC, whose interest was assigned to Seller.

"**Person**" means without limitation a natural person, partnership, limited partnership, limited liability partnership, corporation, limited liability company, joint stock company, trust, unincorporated

- 21 -

association, joint venture or other entity or Governmental Authority, and pronouns have a similarly extended meaning, including without limitation a (ii) person of any kind, now or hereafter existing, with or without any legal relationship to Mr. Stephen E. Witmer, the Buyer, and/or any Affiliates and (ii) a "person" as defined under the Bankruptcy Code.

"**Proceeding**" means any action (including pre-litigation proceedings), hearing, or complaint (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"**Release**" means any release, spill, emission, seepage, leaking, pumping, pouring, emptying, escaping, dumping, abandoning, injecting, depositing, disposing, dispersing, discharging, leaching or migration into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building or structure).

"**Reserve Fund**" means the Reserve Fund established under the Indenture.

"**Secured Equipment Claims**" means the $580,000 secured value of the Equipment Claims.

"**Seller Related Parties**" means (i) any Affiliate of Seller; (ii) any Affiliate of Stephen E. Witmer;  (iii) any entity in which the Seller and/or Mr. Stephen E. Witmer and/or any of their affiliates, have now or will have in the future, a direct or indirect interest, relationship, mutual privity of contract of any kind, or an agreement, public or private, which benefits, obligates, or involves Mr. Stephen E. Witmer, the Seller, and/or any of their affiliates; (iv) Stephen E. Witmer; (v) CWI Enterprises LLC; (vi) CWI Alabama LLC; (vii) CWI Alabama Member LLC; (viii) CWI Transfer HSV LLC; and (ix) CWI Environmental Services LLC.

"**Series 2020 Bonds**" means all outstanding bonds under the Indenture.

"**Shoals Transfer Station**" shall have the meaning assigned thereto in the Lease.

"**Smith Claim**" means the $900,000 claim of Brook Smith against the Buyer's bankruptcy estate.

"**State Court Lawsuit**" means the lawsuit filed by Buyer against Seller and Stephen E. Witmer  in the Circuit Court of Colbert County, Alabama on or about March 1, 2023, Case No. 2023-900330.

"**Tax**" and "**Taxes**" means, whether disputed or not, any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, customs duties, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, escheat, unclaimed property, sales, use, transfer, value added, alternative, estimated add-on minimum and other tax, fee, assessment, reassessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Authority or payable as a result of being a member of an affiliated, consolidated, combined, unitary or similar group, under any Tax-sharing agreement, any other contract, or otherwise.

"**Transactions**" means the transactions and agreements contemplated by this Agreement.

"**Trustee**" means UMB Bank, N.A., not in its individual capacity, but solely in its capacity as successor trustee under the Indenture.

## 13. **TERMINATION**

13.1.      Termination.  This Agreement may be terminated by a Party as follows:

(a) At any time prior to the Closing Date by the mutual written agreement of the Parties;

(b) By Buyer upon the material breach by Seller of this Agreement, provided that Buyer provides Seller with written notice of such claimed breach and Seller fails to cure same within fifteen (15) days from the date of notice;

(c) By Seller upon the material breach by Buyer of this Agreement, provided that Seller provides Buyer with written notice of such claimed breach and Purchaser fails to cure same within fifteen (15) days from the date of notice; except there is no notice and cure for Buyer's failure to close by the Closing Date; or

(d) By any Party, in the event that any condition to such Party's obligation to close is not satisfied as set forth in Section 6 (other than through the failure of such Party to comply with its obligations under this Agreement).

13.2.      Effect of Termination.  If this Agreement is terminated as provided herein, this Agreement shall forthwith become void, and there shall be no liability or obligation on the part of any Party or their respective directors, officers, owners, managers, members, agents or representatives *provided, however*, Buyer shall have the right to a return of the Earnest Money deposit as described in the Sale Procedures Order.

## 14. **AS-IS, WHERE IS.**

Notwithstanding any other provision contained herein to the contrary, Buyer acknowledges and agrees that except for the express representations and warranties contained in this Agreement, the Transferred Assets are being sold and conveyed in "As Is - Where Is" condition.  Furthermore, Seller and Buyer agree that anything in this Agreement or otherwise to the contrary notwithstanding:

(a) Buyer has been or shall be given the opportunity to inspect, examine, and investigate each and every aspect of the Transferred Assets either independently or through agents of Buyer's choosing;

(b) Seller makes and shall make to the Purchaser no warranty regarding the Property of any nature, kind, or character whatsoever, either expressed or implied, including without limitation, any warranty as to (i) the quality, nature, adequacy, and physical condition of the Property; (ii) the quality, nature, adequacy, and physical condition of soils, geology, and any groundwater, (iii) the existence, quality, nature, adequacy, and physical  condition of utilities serving the Property, (iv) income potential of the Transferred Assets, (v) value, use, habitability, or merchantability, (vi) the fitness, suitability, or adequacy of the Transferred Assets for any particular use or purpose, (vii) the

- 23 -

zoning or other legal status of the Transferred Assets or any other public or private restrictions on the use thereof, (viii) the compliance of the Property or its operation with all Laws of any governmental or quasi-governmental entity, (ix) the quality of any labor and materials used in any improvements included in the Transferred Assets, (x) the freedom of the Transferred Assets, including all improvements located thereon, from vices or defects, and (xi) the freedom of the Transferred Assets from either latent or apparent defects.

15. **MISCELLANEOUS PROVISIONS**

15.1.    <u>Assignability; Binding Effect.</u>   Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise by either party hereto without the prior written consent of the other party; provided, however, that Buyer may assign all or any part of this Agreement to any subsidiary or Affiliate upon notice to Seller, provided, however, that Buyer shall remain liable for its obligations herein to the extent not fulfilled by such assignee. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  The Buyer and the Seller acknowledge that the Trustee is an intended third-party beneficiary of this Agreement entitled to enforce the Agreement as if it was a party hereto.

15.2.    <u>Governing Law; Venue.</u>   This Agreement shall be governed by the internal laws of the State of Alabama. The Parties hereby agree that any Proceeding brought in connection with, or arising out of this Agreement or the Approval Order shall be brought in the Bankruptcy Court. The Parties reserve all rights regarding the jurisdiction of the Bankruptcy Court, including without limitation the right to have any final orders entered by the U.S. District Court after *de novo* review of the Bankruptcy Court.

15.3.    <u>Notice.</u>   All notices, demands and other communications required or permitted under this Agreement shall be in writing and shall be considered to have been duly given when (i) delivered by hand (with written confirmation of receipt); (ii) when received by the address if sent by overnight mail (with receipt requested); or (iii) on the date sent by e-mail (with confirmation of transmission) if during normal business hours. Such notices must be sent to the respective parties at the following addresses:

If to Seller:

CWI Cherokee LF, LLC
c/o Stephen E. Witmer
3284 Northside Parkway
Suite 600
Atlanta, Georgia 30327

With a copy to:

John A. Christy
Schreeder, Wheeler & Flint, LLP
1100 Peachtree Street NE
Suite 800

- 24 -

Atlanta, Georgia 30309

If to Buyer:

Kerry Underwood, or successor as Chairman
Solid Waste Disposal Authority of the Cities of Muscle Shoals, Sheffield, and Tuscumbia, Alabama
106 E. 6th St.
Tuscumbia, Alabama 35674

With a copy to:

Lee Birchall
Mike Brown
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203

15.4.    Entire Agreement.  This Agreement constitutes the entire agreement among the Parties hereto with respect to the subject matter hereof and supersedes all prior communications, writings and other documents, with regard thereto. No modification, amendment or waiver of any provision hereof shall be binding upon any Party hereto unless it is in writing and executed by all of the parties hereto or, in the case of a waiver, by the Party waiving compliance.

15.5.    Severability.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such terms or provision in any other jurisdiction.

15.6.    Attorneys' Fees.  In the event of a breach of this Agreement, the non-breaching party may bring an action at law or in equity for any damages or other remedies to which it may be entitled. The prevailing party in such dispute shall be entitled to reimbursement from the nonprevailing party for all reasonable legal fees and expenses of suit.

15.7.    Force Majeure.  No liability shall result from delay in performance or nonperformance, in whole or in part, by either of the Parties to the extent that such delay or nonperformance is caused by an event of Force Majeure. "Force Majeure" means an event that is beyond a non-performing Party's reasonable control, including, but not limited to, acts of God, strikes, lock-outs or other industrial/labor disputes, war, riot, civil commotion, terrorist act, malicious damage, epidemics, pandemics, disease outbreaks, public health emergencies, quarantines, fire, flood, storm or natural disaster. Written notice of any delay or non-performance that occurs by reason of Force Majeure shall be provided to the other Party. The Party claiming that a Force Majeure Event has occurred shall use commercially reasonable efforts to mitigate the impact or consequence of the event and to recommence performance whenever and to whatever extent possible without unreasonable delay. If the delay in performance or non-performance continues for thirty (30) days after the date of the occurrence and such failure to perform would constitute a material breach of this Agreement

- 25 -

in the absence of such event of Force Majeure, the Parties shall meet and discuss in good faith any amendments to this Agreement to permit performance under this Agreement. If the Parties are not able to agree on such amendments within thirty (30) days and if delay in performance or non-performance continues, either Party may terminate this Agreement immediately on written notice to the other Party.

15.8. <u>Further Assurances.</u>  The Parties hereto shall execute and deliver such further instruments, documents and agreements as may be necessary or appropriate to carry out the terms and provisions of this Agreement. In furtherance of the above, Seller will execute and deliver to Buyer such instruments of sale, transfer, conveyance, assignment and delivery, consents, assurances, powers of attorney and other similar instruments, and take such other actions as shall be necessary or otherwise be reasonably requested by Buyer or its counsel in order to vest in Buyer all rights, title and interest of Seller in and to the Transferred Assets and otherwise in order to carry out the purposes and intent of this Agreement.

15.9. <u>Headings; Construction; Incorporation of Recitals.</u>  The section and paragraph headings throughout this Agreement are for convenience and reference only and the words contained therein shall not be held to expand, modify, or aid in the interpretation, construction or meaning of this Agreement. The gender and number used in this Agreement are used as a reference term only and shall apply with the same effect whether the Parties are of the masculine, corporate or other form, and the singular shall likewise include the plural. All of the Recitals hereof are incorporated by this reference and are made a part hereof as though set forth at length herein.

15.10. <u>Counterparts; Electronic Signatures.</u>  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which shall constitute but one and the same instrument. This Agreement shall be valid, binding, and enforceable against a Party when executed and delivered by an authorized individual on behalf of the Party by means of (a) an original manual signature; (b) a faxed, scanned, or photocopied manual signature, or (c) any other electronic signature permitted by the federal Electronic Signatures in Global and National Commerce (E-Sign) Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, in each case to the extent applicable.

[SIGNATURES TO FOLLOW]

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed on and as of the Effective Date defined herein by their duly authorized representatives.

<u>Buyer</u>

SOLID WASTE DISPOSAL AUTHORITY OF THE CITIES OF
MUSCLE SHOALS, SHEFFIELD, AND TUSCUMBIA, ALABAMA

By _____

Name _Kerry Underwood_____

Its _Chairman_____

<u>Seller</u>

CWI CHEROKEE LF, LLC

By _____

Name _____

Its _____

- 27 -

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed on and as of the Effective Date defined herein by their duly authorized representatives.

Buyer

SOLID WASTE DISPOSAL AUTHORITY OF THE CITIES OF
MUSCLE SHOALS, SHEFFIELD, AND TUSCUMBIA, ALABAMA

By _____

Name __Kerry Underwood_____

Its __Chairman_____

Seller

CWI CHEROKEE LF, LLC

By _____

Name __Stephen E. Witmer_____

Its __Manager_____

- 27 -

## EXHIBIT A-1

### TRANSFERRED REAL PROPERTY

The Transferred Real Property is described as follows:

(A) Cherokee Landfill

A Parcel of land lying in Section 2, Township 4 South, Range 13 West, Colbert County, Alabama, and being more particularly described as follows: Commence at the NE Corner of the NW ¼ of the NW ¼ of Section 2, T-4-S, R-13-W; thence S 88°38'42" E a distance of 200.10' to a mag nail and washer found (stamped PLS 24022) in the pavement of Cane Creek Road (60' right of way) at the POINT OF BEGINNING; thence S 88°38'42" E a distance of 177.14' to a nail found in the pavement of Cane Creek Road; thence S 01°51'51" W a distance of 312.75' to a Hackberry Tree; thence S 89°24'23" E a distance of 339.72' to an iron pin found (capped "EMS 9687"); thence S 85°52'03" E a distance of 142.46' to an iron pin found (capped "EMS 9687"); thence N 01°00'53" E a distance of 13.20' to an iron pin found (1/2" rebar); thence S 88°58'01" E a distance of 458.09' to an iron pin found (capped PLS 24022); thence N 00°21'49" W a distance of 299.48' to a mag nail and washer found (stamped PLS 24022) in the pavement of Cane Creek Road; thence S 88°38'42" E a distance of 993.44' to a mag nail and washer found (stamped PLS 24022) in the pavement of Cane Creek Road; thence S 00°00'15" E a distance of 1359.95' to a concrete monument found (TVA #149); thence S 00°06'48" E a distance of 605.72' to a concrete monument found damaged (TVA #148) on the North line of Longvue Subdivision (Vacated) as recorded in Map Book 3, Pages 41-42, in the office of the Judge of Probate of Colbert County, Alabama; thence along said North line, N 89°17'41" W a distance of 332.99' to a concrete monument found (TVA #147); thence S 00°17'22" E a distance of 738.23' to a crimped top pin found beside damaged concrete monument (TVA #146); thence N 87°52'06" W a distance of 657.00' to an iron pin found(capped PLS 24022); thence S 00°13'01" E a distance of 1974.94' to a crimp top pin found on the Northern right of way line of the Norfolk Southern Railroad; thence along said Northern right of way line, N 75°51'54" W a distance of 1095.95' to an iron pin found (capped PLS 24022); thence leaving said Northern right of way line and along the Centerline of Hubbard Avenue (Vacated), N 00°02'03" W a distance of 615.46' to an iron pin set (capped PLS 33944) at the Centerline intersection of Hoyt Street(Vacated); thence along the Centerline of Hoyt Street (Vacated), S 89°17'41" E a distance of 125.00' to an iron pin set (capped PLS 33944); thence N 00°01'32" W a distance of 125.00' to an iron pin found (capped PLS 24022) at the Northeast corner of Lot 547 of Longvue Subdivision; thence along the north line of lot 547 and an extension thereof, N 89°17'41" W a distance of 125.00' to an iron pin found (capped PLS 24022) on the Centerline of Hubbard Avenue (Vacated); thence along the Centerline of Hubbard Avenue (Vacated), N 00°02'03" W a distance of 1701.64' to an iron pin found (capped PLS 24022) on the Northern line of said Longvue Subdivision; thence along the Northern line of Longvue Subdivision, N 89°17'41" W a distance of 55.00' to an iron pin found (capped PLS 24022); thence N 00°03'27" W a distance of 1989.48' to the POINT OF BEGINNING

(B) Shoals Transfer Station

A tract of land, being a part of Section 23, Township 4 South, Range 11 West, Colbert County, Alabama, and part of Lot 2, A Resurvey of a Portion of Colbert Industrial Park, as recorded in Plat Book 5, Page 26, in the Probate Office of Colbert County, Alabama, being more particularly described as follows: COMMENCE at the Southeast corner of said Section 23; thence North 88 degrees 01 minutes 10 seconds

West along the South line of said Section 23 for a distance of 2347.71 feet to a point; thence continuing along said South line North 88 degrees 43 minutes 16 seconds West for a distance of 2020.71 feet to a point on the East right of way margin of U.S. Highway 43 (200' right of way); thence North 01 degrees 40 minutes 39 seconds West along the East margin of said right of way for a distance of 3428.59 feet to a point; thence leaving said right of way, North 88 degrees 19 minutes 21 seconds East along the Southern terminus of a 50 foot access road right of way for a distance of 49.55 feet to a point; thence South 52 degrees 35 minutes 42 seconds East for a distance of 388.85 feet to a 1" solid bar found; thence North 00 degrees 56 minutes 01 seconds West for a distance of 121.91 feet to a crimp top pipe found; thence South 60 degrees 07 minutes 30 seconds East for a distance of 164.26 feet to a rebar found capped PLS#18977; thence North 01 degrees 14 minutes 08 seconds West for a distance of 137.13 feet to a 1/2" pipe found on the Southern right of way margin of a 50 foot right of way; thence South 52 degrees 31 minutes 37 seconds East along said right of way for a distance of 85.23 feet to a 6" x 6" concrete monument found; thence continuing along said right of way, South 52 degrees 43 minutes 48 seconds East for a distance of 93.39 feet to a 6" x 6" concrete monument found at a point on a curve to the left, having a radius of 171.73 feet, a chord bearing of South 63 degrees 14 minutes 49 seconds East and a chord length of 62.94 feet; thence along the arc of said curve and continuing along said right of way, for a distance of 63.30 feet to an iron pin set (capped Jamey Alexander PLS #24022) and the POINT OF BEGINNING of the tract herein described; thence with a chord bearing of South 85 degrees 32 minutes 58 seconds East and chord length of 69.90 feet, continue along said curve to the left and along said right of way for an arc distance of 70.39 feet to a rebar found capped PLS#18977; thence North 82 degrees 43 minutes 37 seconds East along said right of way for a distance of 34.48 feet to a rebar found capped PLS#18977; thence North 00 degrees 55 minutes 09 seconds East for a distance of 41.85 feet to a rebar found capped PLS#13406; thence continuing North 00 degrees 59 minutes 06 seconds East for a distance of 49.97 feet to a rebar found capped PLS#13406; thence South 87 degrees 55 minutes 46 seconds West for a distance of 40.24 feet to a rebar found capped PLS#13406; thence North 00 degrees 51 minutes 44 seconds East for a distance of 48.93 feet to a metal fence corner; thence North 87 degrees 41 minutes 55 seconds East for a distance of 261.49 feet to an iron pin set; thence South 71 degrees 08 minutes 37 seconds East for a distance of 174.36 feet to an iron pin set; thence South 08 degrees 29 minutes 17 seconds East for a distance of 162.52 feet to a point; thence South 84 degrees 33 minutes 06 seconds West for a distance of 411.94 feet to a point; thence North 68 degrees 42 minutes 57 seconds West for a distance of 105.03 feet to a point; thence North 06 degrees 48 minutes 11 seconds West for a distance of 69.85 feet to the POINT OF BEGINNING of the tract of land hereby described; said tract of land contains 2.27 acres, more or less, and is subject to any public roads of public record and is subject to any and all easements or restrictions of record or unrecorded affecting said property

**EXHIBIT A-2**

LEASES

The Buyer includes the following lease in its bid:

1.          Lease Agreement dated June 23, 2020 between the Seller and the Buyer

The Buyer excludes the following sublease from its bid:

1.          Ground Sublease and Lease of Improvements dated June 23, 2020 between CWI Transfer HSV, LLC and Seller

**EXHIBIT A-3**

EQUIPMENT

The Buyer includes the following equipment in its bid:

    One (1) Caterpillar 306 Hydraulic Excavator (Serial No. 6G600862)
    One (1) Caterpillar 279D3C Compact Tract Loader (Serial No. RB901314)
    One (1) Caterpillar D6N dozer
    One (1) Caterpillar 826 Compactor (Serial No. CAT0826KTZ3206415)
    One (1) Komatsu PC490LC-10 Hydraulic Excavator (Serial No. A40251)
    One (1) Komatsu D61PX-23 Crawler Dozer (Serial No. 31458)
    One (1) Komatsu D85PX-18 Crawler Dozer (Serial No. 23107)
    One (1) Komatsu HM400-5 Articulated Truck (Serial No. 10282)

    One (1) Komatsu D61PXI-24 Crawler Dozer (Serial No. B60660)

**<u>EXHIBIT A-4</u>**

ASSUMED CONTRACTS

The Buyer assumes the following contracts in its bid:

1.  Lease Agreement dated June 23, 2020 between the Seller and the Buyer.

2.  Amended and Restated Royalty Agreement dated December 15, 2019 between P&F Industrial Enterprises, Inc., and CWI Alabama, LLC, whose interest was assigned to Seller.

3.  Disposal Agreement dated June 23, 2020 between the Seller and the Buyer.

## **EXHIBIT B**

Bill of Sale

<u>BLANKET CONVEYANCE, BILL OF SALE AND ASSIGNMENT</u>

THIS INSTRUMENT, executed this **____** day of _____October, 2023, by and between CWI CHEROKEE LF, LLC, as Seller; and SOLID WASTE DISPOSAL AUTHORITY OF THE CITIES OF MUSCLE SHOALS, SHEFFIELD, AND TUSCUMBIA, ALABAMA, an Alabama public corporation , as Buyer.

<u>W I T N E S S E T H</u>   <u>T H A T</u>:

WHEREAS, Seller leases real property located in Colbert County, Alabama pursuant to a Lease Agreement dated June 23, 2020 between the Seller and the Buyer known as the Cherokee Landfill and the Shoals Transfer Station, said property being more particularly described in <u>Exhibit "A"</u> attached hereto and made a part hereof by reference (herein the "Property"); and

WHEREAS, Purchaser is purchasing certain assets from Seller pursuant to an Asset Purchase Agreement effective as of September __. 2023   (the "APA") in which the Seller has contracted to assign, transfer and convey to Buyer all personal property, contract and other rights, trade names, warranties and other items of personal property, both tangible and intangible, affixed to, situated upon, used or useful in connection with the aforesaid Property or the development, construction use, operation, occupancy and enjoyment thereof as identified in the APA.

NOW, THEREFORE, for Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller hereby assigns to Buyer, its successors and assigns, all of Seller's right, title and interest in the following property:

(1) All furniture, machinery, equipment, and tools either owned or leased by Seller and located on or with respect to the Property which is necessary for the operation of the Property as identified in the APA, including specifically vehicles as set forth below:
   a. One (1) Caterpillar 306 Hydraulic Excavator (Serial No. 6G600862)
   b. One (1) Caterpillar 279D3C Compact Tract Loader (Serial No. RB901314)
   c. One (1) Caterpillar D6N dozer
   d. One (1) Caterpillar 826 Compactor (Serial No. CAT0826KTZ3206415)
   e. One (1) Komatsu PC490LC-10 Hydraulic Excavator (Serial No. A40251)
   f. One (1) Komatsu D61PX-23 Crawler Dozer (Serial No. 31458)
   g. One (1) Komatsu D85PX-18 Crawler Dozer (Serial No. 23107)
   h. One (1) Komatsu HM400-5 Articulated Truck (Serial No. 10282)
   i. One (1) Komatsu D61PXI-24 Crawler Dozer (Serial No. B60660)

(2) All of Seller's interest in business licenses and operating permits, including all environmental

1

and discharge permits relative to the Property;

(3) All engineering or related operational work product, designs, and plans relative to the Property, whether for actual or potential past, present, or future use;

(4) It is the intent of this instrument to convey all tangible and intangible property, fixtures, contract and other rights and benefits related to the Property as described in the APA. This assignment is without recourse or warranty by Seller and is made pursuant to an order of the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division entered on September ___, 2023 in Case No. 23-52262-SMS.

SELLER MAKES NO WARRANTY OF REPRESENTATION REGARDING THE EXISTENCE OR ASSIGNABILITY OF ANY MATTER PURPORTEDLY ASSIGNED, THE CONDITION OF THE PROPERTY HEREIN ASSIGNED, OR ITS FITNESS FOR A PARTICULAR PURPOSE. Said property is conveyed **AS IS, WHERE IS**.

IN WITNESS WHEREOF, Seller has signed and sealed this instrument as of the date first written above.

Signed, sealed, delivered in the
Presence of:                                             CWI CHEROKEE LF, LLC

_____
 Witness                                                  By:_____
                                                          Name:_____
                                                          Title:_____

_____
Notary Public

[Notary Seal]
K:\10773\1\23-52262\Bids\SWDAr\BOS.docx

2

## <u>EXHIBIT C</u>

Allocation Required by Section 2.2

The Authority allocates its purchase price set forth in Section 2.1 hereof as follows:

100% to the Landfill, the Shoals Transfer Station, the Equipment, and the Joint Release set forth in Section 2.1(a) herein.

The Authority's bid is for both the Landfill and the Shoals Transfer Station.  The Authority is not bidding on the Huntsville Transfer Station.

**EXHIBIT D**

Form of Release to be Executed by Seller, Seller Related Parties, Buyer, and Buyer Related Parties

## GENERAL MUTUAL RELEASE

This *General Mutual Release* (this "**Release**"), dated as of October ___ 2023 (the "**Effective Date**"), is hereby executed by CWI CHEROKEE LF LLC, a Alabama limited liability company, STEPHEN E. WITMER, a Georgia resident, CWI ENTERPRISES LLC, a Georgia limited liability company, CWI ALABAMA LLC, an Alabama limited liability company, CWI ALABAMA MEMBER LLC, a Georgia limited liability company, CWI TRANSFER HSV LLC, an Alabama limited liability company, and CWI ENVIRONMENTAL SERVICES LLC, a Georgia limited liability company (collectively, the "**Seller Parties** " and each a "**Seller Party**"), on the one hand (collectively, the "Seller Parties" and each a "Seller Party"),  and the SOLID WASTE DISPOSAL AUTHORITY OF MUSCLE SHOALS, SHEFFIELD, AND TUSCUMBIA, ALABAMA, an Alabama public corporation, the SHOALS SOLID WASTE DISPOSAL AUTHORITY, an Alabama public corporation, the CITY OF SHEFFIELD, ALABAMA, an Alabama municipality, the CITY OF TUSCUMBIA, ALABAMA,  an Alabama municipality, and the CITY OF MUSCLE SHOALS, ALABAMA, an Alabama municipality, on the other hand (collectively, the "**Buyer Parties**" and each a "**Buyer Party**"; and the Buyer Parties collectively with the Seller Parties, the "**Parties**" and each a "**Party**").   Unless otherwise defined herein all capitalized terms have the same meaning as given in that certain *Asset Purchase Agreement* entered into by Seller and Buyer dated as of September ___, 2023  (the "**APA**").

**WHEREAS**, the Solid Waste Disposal Authority of Muscle Shoals, Sheffield, and Tuscumbia, Alabama filed suit in the Circuit Court of Colbert County Alabama on  March 1, 2023 against CW Cherokee LF, LLC and Stephen E. Witmer, Case No.2023-900330 (the "Lawsuit")

**WHEREAS**, CWI Cherokee LF LLC ("**Seller**") filed Chapter 11 bankruptcy on or about March 7, 2023, Case No. 23-52262 (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Northern District of Georgia (the "**Bankruptcy Court**"), staying the Receivership Action;

**WHEREAS**, on or about June 1, 2023, the Bankruptcy Court entered an *Order On Debtor's Motion To Sell Assets Free And Clear Of Liens, Claims, And Encumbrances, Directing Bidding Procedures, And Setting Preliminary And Final Hearings* [Doc. 107] (the "Sale Order"), setting for the terms and conditions pursuant to which certain of Seller's assets would be marketed and offered for sale;

**WHEREAS**, the Solid Waste Disposal of Muscle Shoals, Sheffield, and Tuscumbia, Alabama ("**Buyer**") was winning bidder for those assets of the Seller, and on or about September ___, 2023 entered into that certain *Asset Purchase Agreement* (the "**APA**") with the Seller pursuant to which Buyer agreed to acquire certain assets of the Seller and assume certain liabilities of the Seller in exchange for certain consideration more fully detailed therein;

**WHEREAS**, the APA required as a condition of closing among other things that the Seller Parties and the Buyer Parties execute the instant Release, a true and correct copy of which was attached to the APA as an exhibit and fully incorporated therein;

**WHEREAS**, on _____, the Bankruptcy Court entered an Order approving the APA;

**WHEREAS**, execution of this Release is a condition to the execution and delivery of the APA, and Seller desires to release claims that each Party may have against the other, in accordance with the terms and conditions set forth herein; and

**WHEREAS**, unless otherwise defined herein all capitalized terms have the same meaning as given in the APA;

**NOW, THEREFORE**, in consideration of the benefits to be derived by each Party, directly and/or indirectly, from the transactions contemplated by the APA and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, each Party hereby agrees as follows:

1.      <u>**Release by Seller Parties**</u>.  The Seller Parties, for themselves and their past, present and future predecessors, successors, assignees, parent companies, subsidiaries, related companies, commonly controlled entities, and members, and each of their past and present officers, directors, board members, shareholders, members, officials, employees, attorneys, representatives, vendors, managers, insurers, agents, underwriters, affiliates, certified public accountants, financial advisors, municipal advisors, attorneys, law firms, accountants, financial advisers, municipal advisers, engineers and other professional service providers, if any, and each of them (collectively, the "**Seller Releasors**") hereby unconditionally, irrevocably, forever and fully release, acquit, and forever discharge the Buyer Parties and their past, present and future predecessors, successors, assignees, parent companies, subsidiaries, related companies, commonly controlled entities, and members, and each of their past and present officers, directors, board members, shareholders, members, officials, employees, attorneys, representatives, vendors, managers, insurers, agents, underwriters, underwriters' counsel, affiliates, certified public accountants, financial advisors, municipal advisors, mayors, councilmembers, commissioners, elected officials, attorneys, law firms, accountants, financial advisers, municipal advisers, engineers and other professional service providers, if any, and each of them (collectively, the "**Seller Releasees**"), of and from any and all claims, demands, actions, causes of action, suits, liens, debts, obligations, promises, agreements, costs, damages, liabilities, and judgments of any kind, nature, or amount whether in law or equity, whether known or unknown, anticipated or unanticipated, liquidated or unliquidated, including any and all claimed or unclaimed compensatory damages, consequential damages, interest, costs, expenses, and fees (including reasonable or actual attorneys' fees) arising out of or from or relating in any way to any and all acts or omissions occurring prior to the Effective Date and those claims which were or could have been asserted in the Lawsuit (collectively, the "**Seller Released Claims**").  The Seller Released Claims include, without limitation, any claims under federal, state or local laws, and any common law tort, contract or statutory claims, alleged bad faith, breach of any alleged contractual, indemnity, management, fiduciary or other duties by the Seller Releasees, and any claims for attorneys' fees and costs, specifically including damages for the impairment and devaluation of (i) any Seller's ownership interest in any Seller entity and (ii) Seller assets being sold pursuant to the APA.  It is the intention and effect of this Paragraph to discharge all claims that the Seller Releasors have against the Seller Releasees up until and including the Effective Date. In addition, the Seller Parties covenant not to sue the Seller Releasees or any other person or entity, for any claim the Seller Parties have or may have had as of the Effective Date, relating to the matters mentioned in the Recitals herein.  The Seller Releasors acknowledge and agree that they may hereafter discover facts different from, or in addition to, those facts known to it and now believes to be true with respect to any and all of the claims, demands, actions, causes

of action, suits, liens, debts, obligations, damages, liabilities, judgments, costs, expenses, and fees (including reasonable attorney's fees) existing on the Effective Date. The Seller Releasors nevertheless agree that the releases set forth herein have been negotiated and agreed upon, notwithstanding such acknowledgment and agreement, and hereby expressly waives any and all rights which it may have under any federal or state statute or common law principle which may provide that a general release does not extend to claims which are not known to exist at the time of execution. The Seller Releasors understand and acknowledge the significance and consequences of this waiver and assume full responsibility for any and all damages, losses, costs, and expenses they have incurred or may incur hereafter as a result of their releases in this Paragraph.

2.    **Release by Buyer Parties**. The Buyer Parties, for themselves and their past, present and future predecessors, successors, assignees, parent companies, subsidiaries, related companies, commonly controlled entities and members, and each of their past and present officers, directors, board members, shareholders, members, officials, employees, attorneys, representatives, vendors, managers, insurers, agents, underwriters, affiliates, certified public accountants, financial advisors, municipal advisors, mayors, councilmembers, commissioners, elected officials, attorneys, law firms, accountants, financial advisers, municipal advisers, engineers and other professional service providers, if any, and each of them (collectively, the "**Buyer Releasors**" and collectively with the Seller Releasors, the "**Releasors**") hereby unconditionally, irrevocably, forever and fully release, acquit, and forever discharge the Seller Parties and their past, present and future predecessors, successors, assignees, parent companies, subsidiaries, related companies, commonly controlled entities, and members, and each of their past and present officers, directors, board members, shareholders, members, officials, employees, attorneys, representatives, vendors, managers, insurers, agents, underwriters, underwriters' counsel, affiliates, certified public accountants, financial advisors, municipal advisors, attorneys, law firms, accountants, financial advisers, municipal advisers, engineers and other professional service providers, if any, and each of them (collectively, the "**Buyer Releasees**" and collectively with the Seller Releasees, the "**Releasees**"), of and from any and all claims, demands, actions, causes of action, suits, liens, debts, obligations, promises, agreements, costs, damages, liabilities, and judgments of any kind, nature, or amount whether in law or equity, whether known or unknown, anticipated or unanticipated, liquidated or unliquidated, including any and all claimed or unclaimed compensatory damages, consequential damages, interest, costs, expenses, and fees (including reasonable or actual attorneys' fees) arising out of or from or relating in any way to any and all acts or omissions occurring prior to the Effective Date and those claims which were or could have been asserted in the Lawsuit (collectively, the "**Buyer Released Claims**" and collectively with the Seller Released Claims, the "**Released Claims**"). The Buyer Released Claims include, without limitation, any claims under federal, state or local laws, and any common law tort, contract or statutory claims, alleged bad faith, breach of any alleged contractual, indemnity, management, fiduciary or other duties by the Buyer Releasees, and any claims for attorneys' fees and costs. It is the intention and effect of this Paragraph to discharge all claims that the Buyer Releasors have against the Buyer Releasees up until and including the Effective Date. In addition, the Buyer Parties covenant not to sue the Seller Releasees or any other person or entity, for any claim the Buyer Parties have or may have had as of the Effective Date, relating to the matters mentioned in the Recitals herein. The Buyer Releasors acknowledge and agree that they may hereafter discover facts different from, or in addition to, those facts known to it and now believes to be true with respect to any and all of the claims, demands, actions, causes of action, suits, liens, debts, obligations, damages, liabilities,

judgments, costs, expenses, and fees (including reasonable attorney's fees) existing on the Effective Date. The Buyer Releasors nevertheless agree that the releases set forth herein have been negotiated and agreed upon, notwithstanding such acknowledgment and agreement, and hereby expressly waives any and all rights which it may have under any federal or state statute or common law principle which may provide that a general release does not extend to claims which are not known to exist at the time of execution. The Buyer Releasors understand and acknowledge the significance and consequences of this waiver and assume full responsibility for any and all damages, losses, costs, and expenses they have incurred or may incur hereafter as a result of their releases in this Paragraph.

3. **Release Extent and Limitations:** This Release does not release claims arising out of the failure of either Party to perform in conformity with the terms of the APA or this Release. It is the intention of the Parties that no claim intended to be released has been, through oversight or error, intentionally or unintentionally, omitted from this Release.

4. **Warranties and Representations:** Each Party hereto warrants and represents that (a) it is the sole owner of the respective Released Claims, and (b) it has not assigned, transferred, conveyed, or purported to assign, transfer, or convey to any person or entity any right, claim, action, cause of action, suit (at law or in equity), defense, demand, debt, liability, account, or obligation herein released, or any part thereof, which would, absent such assignment, transfer or conveyance, be a respective Released Claim.

5. **Acknowledgments:** Each of the Parties acknowledges and agrees that:

a. This Release is entered into and executed voluntarily by each of the Parties hereto and without any duress or undue influence on the part of, or on behalf of, any such Party.

b. Each of the Parties hereto has been represented by counsel of its own choice, or has had the opportunity to be represented by counsel and to seek advice in connection with the negotiations for, and in the preparation of, this Release, and that it has read this Release and is fully aware of its contents and legal effects.

c. The drafting and negotiation of this Release has been undertaken by all Parties hereto and their respective counsel. For all purposes, this Release shall be deemed to have been drafted jointly by all of the Parties hereto with no presumption in favor of one Party over another in the event of any ambiguity.

d. This Release represent the entire agreement of the Parties with respect to the claims released and any amendment to this Release must be in writing and signed by the Party to be bound.

6. **Binding Effect:** This Release shall be binding on, and shall inure to the benefit of, the Parties hereto, each of the respective other Releasees, and their respective administrators, representatives, successors, and assigns.

7. **Governing Law:** This Release and all claims arising out of this Release shall be governed by and construed in accordance with the internal laws of the State of Alabama, without giving effect to any choice or conflict of law provision or rule (whether of the State of Alabama or

4

any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Alabama.  In the event of any suit between a Party and any of the Releasees, the prevailing party shall be entitled to its costs, expenses, and attorneys' fees as well as any and all other remedies specifically authorized under the law.  If any provision of this Release is deemed invalid, the remaining provisions will still be given full force and effect.

**IN WITNESS WHEREOF**, the undersigned have caused this Release to be executed as of the date first written above by their respective representatives thereunto duly authorized.

## [**SIGNATURE PAGES FOLLOW**]

**(Signature Page for CWI Cherokee LF LLC-*Mutual General Release* Dated September \_\_\_, 2023)**

**CWI CHEROKEE LF LLC**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____**                    )

**COUNTY OF _____**                    )

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ whose name as _____ of **CWI CHEROKEE LF LLC**, is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this \_\_\_\_\_ day of September 2023.

_____

(SEAL)                                      NOTARY PUBLIC
                                           My Commission Expires: _____

**(Signature Page for Stephen E. Witmer-*Mutual General Release* Dated September \_\_\_,
2023)**

**STEPHEN E. WITMER**

_____

**STATE OF _____**                    **)**

**COUNTY OF _____**                    **)**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that
**STEPHEN E. WITMER**, whose name is signed to the foregoing instrument, and who is known to
me, acknowledged before me on this day that, being informed of the contents of the instrument, he
executed the same voluntarily as of the day the same bears date.

Given under my hand and official seal, this the _____ day of September 2023.

_____

NOTARY PUBLIC

(SEAL)                    My Commission Expires: _____

**(Signature Page for CWI Enterprises LLC-*Mutual General Release* Dated September \_\_\_, 2023)**

**CWI ENTERPRISES LLC**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____          )**

**COUNTY OF _____          )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ whose name as _____ of **CWI ENTERPRISES LLC**, is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this \_\_\_\_\_ day of September 2023.

_____

NOTARY PUBLIC

(SEAL)                         My Commission Expires: _____

**(Signature Page for CWI Alabama LLC-*Mutual General Release* Dated September \_\_\_, 2023)**

**CWI ALABAMA LLC**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____ )**

**COUNTY OF _____ )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ whose name as _____ of **CWI ALABAMA LLC**, is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this \_\_\_\_\_ day of September 2023.

_____
NOTARY PUBLIC

(SEAL)                              My Commission Expires: _____

**(Signature Page for CWI Alabama Member LLC-*Mutual General Release* Dated
September ___, 2023)**

**CWI ALABAMA MEMBER LLC**

By:        _____

Its:        _____

Print Name:        _____

Dated: _____

**STATE OF _____            )**

**COUNTY OF _____            )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that
_____ whose name as _____ of **CWI
ALABAMA MEMBER LLC**, is signed to the foregoing, and who is known to me, acknowledged
before me on this day that, being informed of the contents of the foregoing, s/he, as such officer
and with full authority, executed the same voluntarily for and as the act of said limited liability
company.

        Given under my hand and official seal, this _____ day of September 2023.

                    _____
                    NOTARY PUBLIC
(SEAL)                My Commission Expires: _____

**(Signature Page for CWI Transfer HSV LLC-*Mutual General Release* Dated September
___, 2023)**

**CWI TRANSFER HSV LLC**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____    )**

**COUNTY OF _____    )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that
_____ whose name as _____ of **CWI
TRANSFER HSV LLC**, is signed to the foregoing, and who is known to me, acknowledged
before me on this day that, being informed of the contents of the foregoing, s/he, as such officer
and with full authority, executed the same voluntarily for and as the act of said limited liability
company.

Given under my hand and official seal, this _____ day of September 2023.

_____
NOTARY PUBLIC

(SEAL)                    My Commission Expires: _____

**(Signature Page for CWI Environmental Services LLC-*Mutual General Release* Dated September \_\_\_, 2023)**

**CWI ENVIRONMENTAL SERVICES LLC**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____          )**

**COUNTY OF _____          )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ whose name as _____ of **CWI Environmental Services LLC** is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this \_\_\_\_\_ day of September 2023.

_____
NOTARY PUBLIC
(SEAL)                              My Commission Expires: _____

**(Signature Page for Solid Waste Disposal Authority of Muscle Shoals, Sheffield, and Tuscumbia-*Mutual General Release* Dated September \_\_\_, 2023)**

**SOLID WASTE DISPOSAL AUTHORITY OF MUSCLE
SHOALS, SHEFFIELD, AND TUSCUMBIA**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____            )**

**COUNTY OF _____            )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ whose name as _____ of **Solid Waste Disposal Authority of Muscle Shoals, Sheffield, and Tuscumbia** is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this \_\_\_\_\_ day of September 2023.

_____
NOTARY PUBLIC

(SEAL)                    My Commission Expires: _____

**(Signature Page for Shoals Solid Waste Disposal Authority-*Mutua*l *General Release* Dated
September \_\_\_, 2023)**

**SHOALS SOLID WASTE DISPOSAL AUTHORITY**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____            )**

**COUNTY OF _____            )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that
_____ whose name as _____ of **Shoals
Solid Waste Disposal Authority** is signed to the foregoing, and who is known to me,
acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as
such officer and with full authority, executed the same voluntarily for and as the act of said limited
liability company.

Given under my hand and official seal, this \_\_\_\_\_ day of September 2023.

_____
NOTARY PUBLIC
(SEAL)                          My Commission Expires: _____

**(Signature Page for City of Muscle Shoals, Alabama-*Mutua*l *General Release* Dated
September \_\_\_, 2023)**

**CITY OF MUSCLE SHOALS, ALABAMA**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____        )**

**COUNTY OF _____        )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that
_____ whose name as _____ of **City of
Muscle Shoals, Alabama** is signed to the foregoing, and who is known to me, acknowledged
before me on this day that, being informed of the contents of the foregoing, s/he, as such officer
and with full authority, executed the same voluntarily for and as the act of said limited liability
company.

Given under my hand and official seal, this \_\_\_\_\_ day of September 2023.

_____

NOTARY PUBLIC

(SEAL)                                     My Commission Expires: _____

**(Signature Page for City of Sheffield Alabama-*Mutua*l *General Release* Dated September ___, 2023)**

**CITY OF SHEFFIELD, ALABAMA**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____    )**

**COUNTY OF _____    )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ whose name as _____ of **City of Sheffield, Alabama** is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this _____ day of September 2023.

_____

NOTARY PUBLIC

(SEAL)                    My Commission Expires: _____

**(Signature Page for City of Tuscumbia, Alabama-*Mutua*l *General Release* Dated September ___, 2023)**

**CITY OF TUSCUMBIA, ALABAMA**

By: _____

Its: _____

Print Name: _____

Dated: _____

**STATE OF _____      )**

**COUNTY OF _____      )**

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ whose name as _____ of **City of Tuscumbia, Alabama** is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this _____ day of September 2023.

_____

NOTARY PUBLIC

(SEAL)                                     My Commission Expires: _____

CERTIFICATE OF SERVICE

This is to certify that the foregoing document has been served on all parties

identified on the Limited Service List in this case via the Court's CM/ ECF system

and/or by placing the same in the First Class U.S. Mail, as indicated on the attached

service list.

This 8th day of September, 2023.

/s/ Jonathan A. Akins
JONATHAN A. AKINS
Georgia Bar No. 472453

SCHREEDER, WHEELER & FLINT, LLP
1100 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309-4516
Tel: (404) 681-3450
Fax: (404) 681-1046
K:\10773\1\23-52262\Pleadings\App to employ investment banker.DOCX

## SERVICE LIST

*Via ECF / Email*

Alan Hinderleider
Office of the United States Trustee
75 Ted Turner Drive, SW, Room 362
Atlanta, Georgia 30303
alan.hinderleider@usdoj.gov

Arent Fox LLP
1301 Avenue of the Americas
42nd Floor
New York, NY 10019
randall.brater@arentfox.com
michael.guippone@afslaw.com

Lee B. Hart
Nelson Mullins Riley & Scarborough LLP
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363
lee.hart@nelsonmullins.com

Glenn E. Glover
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
gglover@bradley.com
jbailey@bradley.com

Stephen B. Porterfield
Dentons Sirote PC
2311 Highland Avenue South
PO Box 55727
Birmingham, AL 35255-5727
sporterfield@sirote.com

Kathleen G. Furr
Baker Donelson Bearman, Caldwell & Berkowitz, P.C.
Monarch Plaza, Suite 1500
3414 Peachtree Road, N.E.
Atlanta, GA 30326
kfurr@bakerdonelson.com,

Kevin A. Stine
BAKER DONELSON
1500 Monarch Plaza
3414 Peachtree Road, N.E.
Atlanta, GA 30326
kstine@bakerdonelson.com

Brian Goldberg
Freeman Mathis & Gary, LLP
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948
Brian.goldberg@fmglaw.com

Kyle C. Spurgeon
Clark Hill, PLC
901 Main Street, Ste. 6000
Dallas, Texas 75202
kspurgeon@clarkhill.com

*Via U.S. Mail*

AJ Equity
1648 61st Street
Brooklyn NY 11204

Brickstone Fund
5314 16th Avenue
Suite 139
Brooklyn, NY 11204

Bill Cohen
3630 Peachtree Road, Suite 940
Atlanta, Georgia 30326

Wes Shafto
1818 Avenue of Americas
Monroe, LA 71201

10 Kings LLC
80 W. Wieuca Road NE
Suite 170
Atlanta, Georgia 30342

Marshall Roberts
80 W. Wieuca Road NE
Suite 170
Atlanta, Georgia 30342

Derek Griffin
80 W. Wieuca Road NE
Suite 170
Atlanta, Georgia 30342

The McPherson Companies, Inc.
5051 Cardinal Street
Trussville, AL 35173

Evergreen Environmental
300 Noble Hill Road
Attalla, AL 35954-0010

JLW Contracting LLC
2310 Bennett Road
Jasper, AL 35503

American Services LLC
2281 Stateline Road W
Southaven, MS 38671

Mid South Septic
11284 Gulf Stream Road
Arlington, TN 38002

Todd Moreland
PO Box 3069
Chattanooga, TN 37404

Atomic Transport
PO Box 2548
Chattanooga, TN 80903

Denali
PO Box 740903
Atlanta, Georgia 30374-0903

Burr & Forman LLP
PO Box 830719
Birmingham, AL 35283

Thompson Tractor
PO Box 934005
Atlanta, Georgia 31193

CDG Engineering
PO Box 278
Andalusa, AL 36420